Version 14
## SETTLEMENT AGREEMENT

WHEREAS, on or about July 15, 2004, Helene Regen and Samuel K. Freshman filed suit against iGames Entertainment, Inc., a Nevada corporation, which has since merged into Money Centers of America, Inc. and no longer exists as an independent entity ("iGames"), Available Money, Inc., a Nevada Corporation and wholly owned subsidiary of Money Centers of America, Inc. ("Available Money"), and Christopher M. Wolfington in the U.S. District Court for the District of Delaware, Civil Action No. 04-CV-869, alleging fraud in the inducement, mistake, breach of contract and conversion, and seeking declaratory relief and rescission; and

WHEREAS, on or about July 28, 2004, iGames and Mr. Wolfington filed a Praecipe to Issue Writ of Summons against Howard Regen in the Court of Common Pleas of Philadelphia, Pennsylvania, which was thereafter removed to the United States District Court for the Eastern District of Pennsylvania, identified as Civil Action No. 04-4179, and then transferred to the United States District Court for the District of Delaware, thereafter identified as Civil Action No. 04-1516; and

WHEREAS, on or about January 27, 2005 iGames filed a Complaint against Howard Regen and Coast ATM in the United States District Court for the District of Delaware, under Civil Action No. 04-1516, alleging breach of contract, tortious interference with current and prospective economic relations, breach of the covenant of good faith and fair dealing, unfair competition, violations of Lanham Act, unjust enrichment and conversion along with a Motion for Temporary Restraining Order and for Preliminary Injunction; and

1

WHEREAS, so as to avoid the continued cost and expense and disruption of continued litigation of the aforementioned actions, the parties wish to discontinue litigation and to settle the claims on the following terms and conditions;

NOW, THEREFORE, in consideration of the mutual promises and covenants contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed, by and between the undersigned parties as follows:

1. All of the above-described lawsuits between the parties shall be dismissed with prejudice. Except as to such rights and claims as may be created or excluded by this agreement, the "contracting parties," and Coast ATM, as defined in paragraph 2, on the one hand and iGames and Chris Wolfington on the other hereby mutually release, remise and forever discharge each other, including the others' respective divisions, affiliates, subsidiaries, predecessors and successor corporations and past and present directors, officers, shareholders, agents, employees, representatives, assigns, heirs, successors in interest, predecessors in interest, administrators, adjustors, attorneys and insurers from any and all claims, demands and causes of action, obligations, damages and liabilities between the "contracting parties" as defined in paragraph 2 and Coast ATM, on the one hand, and iGames and Chris Wolfington on the other, whether known or unknown, whether connected with or incidental to the allegations raised in the above-described lawsuits or otherwise. The respective parties will file joint stipulations in the respective actions vacating the preliminary injunction, all orders and sanctions and dismissing all the lawsuits with prejudice.

2. Samuel Freshman, Howard Regen and Helene Regen (collectively, the "Contracting Parties") are to be released from all non-competition and right of first refusal provisions of the Available Money Stock Purchase Agreement ("SPA"), subject to certain

2



Version 14

limitations and obligations as set forth hereafter. The Contracting Parties and Coast ATM are free to pursue any and all ATM Business (as defined in Section 1 of the SPA) subject to the terms outlined herein.

3. The Contracting Parties will not challenge the cancellation of certain shares of iGames stock issued to the Contracting Parties under the terms of the SPA. Such cancellations having been noticed pursuant to the SPA by iGames. It is agreed that these cancellations have totaled one million four hundred seventy thousand five hundred ninety (1,470,590) shares of common stock, representing a $2,000,002 reduction in the Purchase Price under the SPA.

4. The Contracting Parties and Coast ATM will not solicit ATM Business at the locations which were sold under the SPA ("Sold Locations") for the balance of the original non-competition term as stated in the SPA unless the Sold Location has indicated in writing that it does not intend to renew its site contract, and iGames has been given at least seven (7) days prior written notice of the Contracting Party and Coast's intention to solicit the Sold Location. In such event, the Contracting Parties and Coast may solicit that Sold Location for their own account or others and will pay, if successful in securing that account, twenty-five percent (25%) of the net profits it receives from that location to iGames for the length of the contract entered into with the Sold Location or for the balance of the non-competition term, whichever is less, as long as the terms of this Agreement have not been materially breached by iGames and/or Mr. Wolfington. If a material breach has occurred on the part of iGames, MCA, or Wolfington and it has not been cured upon reasonable notice by the Contracting Parties then the restrictions of this paragraph will not be operative.

5. Samuel Freshman and Helene Regen (the "Sellers") and Money Centers acknowledge they have a dispute over whether the purchase price for the stock of Available

3



Money, as adjusted pursuant to Section 7(f) of the SPA, is $3,750,000 (the "Adjusted Purchase Price"), the Sellers have received prior cash payments on account of the Adjusted Purchase Price of $3,850,000. There is a dispute over whether the Sellers are required under the terms of the SPA to repay to Money Centers, as successor to iGames, and alleged overpayment in the amount of $100,000, together with $135,985.98 representing alleged expenses for which they may be required to reimburse iGames under the terms of the SPA, for a total amount alleged due of $235,985.98 (the "Repayment Amount"). The Sellers also alleged they may be entitled to the return of an additional $150,000 since it's their position the adjusted purchase price is $4,000,000. 5 (a) through 5(c) is in settlement of the dispute set forth in this paragraph 5.

5. (a) iGames has agreed to accept a payment of $117,892.99 (the "Repayment Amount") payable half (i.e, $58,996.49) by Helene Regen and Howard Regen (jointly and severally) and half (i.e., $58,996.80) by Samuel Freshman (severally liable for one half of the settlement) in full payment of the claimed amount.

5.(b) The Sellers hereby agree that within 14 days of the date hereof (the "Delivery Date"), Howard and Helene Regen on the one hand (and jointly and severally), and Samuel K. Freshman on the other (severally only), each will (i) pay to iGames their respective share of the Repayment Amount in cash by wire transfer, (ii) waive any claim to the $150,000 balance of the alleged purchase price and (iii) cause all rights to the The Irvine Company contract(s) to be transferred to Available Money.

6. (a) Howard and Helene Regen jointly and severely agree to pay iGames the sanctions ordered in Civil Action U.S. District Court, District of Delaware Civil No 04-1516 in an amount of $7,400 within 14 days of the date hereof.

6. (b) As to legal fees incurred by iGames, Samuel K. Freshman agrees to pay iGames $26,300 (severally only); and Howard and Helene Regen agree to pay iGames $26,300 (jointly

4



Version 14

and severally). Howard and Helene Regen will deliver their $26,300 payment on or before December 31, 2005 with 6% interest added thereto which will accrue from the date of this agreement through the date of payment. Should Howard and Helene default on such payment they will forgo amounts to be paid by iGames pursuant to paragraph 7 below and any and all of their rights to the Life Insurance Policy on Howard Regen currently held by Available Money. Samual Freshman agrees to pay iGames his $26,300 payment within 14 days of the date hereof.

7. The contracting parties and Coast ATM hereby assign all rights, title and interests held by the contracting parties in the Irvine Contract or Contracts (to include any and all Irvine locations) to iGames, Money Centers of America, Available Money, Inc., and Chris Wolfington, collectively identified as the "Assignees" of the Irvine Contract. The Assignees hereby assume and agree to perform all the remaining and executory obligations under the contract and agree to indemnify and hold the contracting parties and Coast ATM harmless from any claims or demands resulting from non-performance by the Assignee. As to the contract between Irvine Company and the contracting parties and Coast ATM, iGames and Chris Wolfington agree to indemnify and hold the contracting parties harmless from any claims or demands resulting from non-performance of that contract by iGames. Chris Wolfington has represented to Sam Freshman that Irvine Company will accept assignment of the Irvine Company contract. This agreement is expressly contingent upon a release of liability from Irvine Company of the contracting parties and Coast ATM as of the date of the assignment and a waiver of the non-assignment clause in the Irvine contract in writing. Prior to execution of this Settlement, iGames or Wolfington will provide a letter from Irvine Cos. Agreeing to said assignment and releasing Coast ATM, and the contracting parties from all terms and liability under said leases as of the date of the assignment. Accordingly, iGames will pay to Helene Regen 25% of the net profits

5



generated from the Irvine Company during the 37th month through the 60th month of The Irvine Contract.

8. New gaming locations obtained by the Contracting Parties and Coast within the United States or its territories, during the original non-competition term as stated in the SPA, do not have to be presented to iGames under the right of first refusal as set forth in the SPA at the election of the Contracting Parties and Coast. However, any such new gaming location, which is not presented to iGames to provide processing and other services shall, if secured by the Contracting Parties and Coast, entitle iGames to twenty five percent (25%) of the net profits of such party at such location received by the Contracting Parties from such party for the balance of the term of the contract with the new gaming location, or for the balance of the non-competition term, whichever is less as long as the terms of this Agreement have not been materially breached (and if so, not cured upon reasonable notice by the Contracting Parties) by iGames and/or Mr. Wolfington.

9. "Net profits" is defined as the net amount received by the Contracting Parties or Coast ATM from a given gaming location after all costs including but not limited to commissions, payments, and the profit shares to processors similar to the formula set out in the SPA. General overhead, payroll, administrative expenses and other expenses not specifically attributable to the actual ATMs of the Contracting Parties at the relevant gaming location shall not be considered an expense.

10. iGames shall only be entitled to the payments above with respect to gaming locations, and there will be no payments due to iGames with respect to any new or renewed locations that the Contracting Parties and Coast secure in any other location.

11. The parties have discussed the possibility of the Contracting Parties performing certain marketing and sales functions for iGames. The parties are equally open to discussing



Version 14

same after execution of this settlement agreement; but there is no obligation on the part of any of them to do so.

12.     In the event that the Contracting Parties and Coast ATM, in their sole discretion, present a gaming location to iGames for servicing, financing, installation and/or processing, the terms of the arrangement will be the same as set forth in the SPA, namely a fifty fifty (50/50) sharing of machine profits, or losses, if any, between the Contracting Parties, Coast ATM and iGames and under the terms provided for servicing, financing, installation and/or processing. Should iGames be unable to provide the required services and financing under the same terms and conditions as called for under the SPA, within 30 days of notice of a new location, then all obligations under this settlement in terms of profit sharing for said location shall not be operative.

13.     Any announcement of the settlement shall be pursuant to a press release agreed to by all parties executing this agreement prior to its issuance.

14.     Upon satisfaction of the obligations of Helene Regen and Howard Regen set forth in Paragraphs 5(a), 5(b) and 6(a), Available Money will assign the Life Insurance Policy on Howard Regen to Samuel Freshman as its escrow agent in accordance with this Paragraph. Samuel Freshman agrees that he will hold the Life Insurance Policy for the benefit of Available Money and himself. After all payments required to be made under the terms of this Agreement by Howard Regen, Helene Regen and Samuel Freshman, including the December 31, 2005 payment by Howard and Helene Regen identified in Paragraph 6(b) above, have been made and confirmed cleared in writing by Christopher Wolfington on behalf of Available Money, Samuel Freshman, as escrow agent, will have full and complete authority to return the policy and all rights to the policy to Helene Regen and Samuel K. Freshman 50% to each as Tenants-in-

7



Common. HELENE REGEN AND HOWARD REGEN HEREBY AGREE THAT IF ANY PAYMENT, INCLUDING THE DECEMBER 31, 2005 PAYMENT REFERENCED IN PARAGRAPH 6(b), REMAINS OUTSTANDING AT 12:01 EASTERN TIME ON THE MORNING OF JANUARY 1, 2006, SAMUEL FRESHMAN WILL, AT THE OPTION OF AVAILABLE MONEY,, EITHER IMMEDIATELY ASSIGN 50% OF THE LIFE INSURANCE POLICY BACK TO AVAILABLE MONEY OR TRADE IN THE POLICY FOR THE CASH VALUE AND 50% OF THE PROCEEDS TO THE EXTENT NECESSARY TO IMMEDIATELY FULFILL ALL OF HELENE REGEN'S AND HOWARD REGEN'S OUTSTANDING PAYMENT OBLIGATIONS HEREUNDER (WITH BALANCE IF ANY TO HELENE REGEN) AND RETAIN 50% OF THE POLICY FOR HIMSELF. IF THE INSURED EXPIRES OR THE LIFE INSURANCE POLICY BECOMES OTHERWISE PAYABLE, ALL AMOUNTS DUE HEREUNDER FROM HELENE REGEN OR HOWARD REGEN SHALL BE IMMEDIATELY PAID FROM ONE-HALF THE PROCEEDS OF THE LIFE INSURANCE POLICY (TO THE EXTENT FUND ARE AVAILABLE FROM THAT HALF) BY SAMUEL FRESHMAN AS ESCROW AGENT, AND ANY REMAINING PROCEEDS FROM THE REGEN HALF SHALL BE PAID BY HIM TO HELENE REGEN. SAMUEL FRESHMAN SHALL RETAIN THE OTHER HALF OF THE PROCEEDS ON POLICY FREE OF ALL CLAIMS FROM ANY OF THE PARTIES.

15. This Agreement represents the full and entire agreement between the parties hereto and all negotiations and communications pertaining to same are hereby considered merged into this Agreement as executed by the Parties. The parties hereto agree that they are sophisticated parties represented by counsel and that in deciding to enter into and execute this settlement agreement they have not relied on any representations not embodied in this settlement



Version 14

agreement. There will be no valid modification of the terms hereof unless reduced to writing and signed by the Parties.

16. All of the provisions of this Agreement shall be binding upon the parties hereto and their respective successors, assigns, heirs and executors and shall inure to the benefit of, and shall be enforceable by the parties and their respective successors, assigns, heirs, and executors. Nothing in this agreement shall be deemed to release any third-parties from any potential claims by any of the parties hereto.

17. This Agreement may be executed by the parties signing same in multiple counterparts, each of which shall be deemed an original and all of which shall be deemed one single agreement.

18. This Agreement has been drafted by the parties hereto and shall not be construed against one party in favor of the other party by reason of any presumption concerning any party drafting this Agreement.

19. The execution of this Agreement is the free and voluntary act of each of the parties, does not occur as the result of any coercion or duress, and is being made after receipt of advice from legal counsel.

20. It is expressly acknowledged and understood that, by entering into this Agreement and the accompanying stipulation of dismissal, none of the parties are admitting liability of any kind, nor does any party renounce any right not otherwise addressed by the terms of this Agreement.

21. In the event that any one or more of the provisions of this Agreement shall for any reason be held to be invalid, illegal, or unenforceable, the same shall not affect any other provision of this Agreement, and such invalid, illegal or unenforceable provisions shall be

9



construed and limited to the extent necessary to make them valid, legal and enforceable, or if this is not possible, then they shall be severed from this Agreement.

22.  If any action is brought because of any breach of, or to enforce, interpret, rescind, or terminate, any of the provisions of this Agreement, the party prevailing in such action shall be entitled to recover from the other party reasonable attorneys' fees and court costs incurred in connection with such action, the amount of which shall be fixed by the court and made a part of any judgment rendered.

23.  This Agreement shall be governed by, and construed in accordance with the laws of the State of Delaware, whether an action sounds in contract or tort, without regard to conflict of laws principles.

24.  The parties agree that all actions and proceedings arising from this Agreement shall only be litigated in courts within the State of Delaware, and hereby consent to the jurisdiction thereof.

25.  The parties hereto represent and warrant to each other and agree with each other as follows:

(a)  Each of them has received independent legal advice from attorneys of their own choice, with respect to the advisability of making the settlement and releases provided for herein, and with respect to the advisability of executing this Agreement, and prior to the execution of this Agreement by the parties hereto, their attorneys reviewed this Agreement at length;

(b)  The parties hereto have each made such investigation of the law pertaining to this settlement and this Agreement, and of all the matters pertaining thereto, as they deem necessary;

10



Version 14

(c) This Agreement has been carefully read by, the contents hereof are known and understood by, and it is signed freely by, each party executing this Agreement;

(d) The parties hereto agree that each of them will not take any action which would interfere with the performance of this Agreement by any other party hereto or which would adversely affect any of the rights provided for herein;

(e) The parties hereto represent and warrant to each other that they are the sole and lawful owners of all right, title and interest in and to every claim released herein, and that they has not heretofore assigned or transferred, or purported to assign or transfer, to any person or entity, any of the released claims. The parties hereto shall indemnify each other, shall defend each of them, and shall hold each of them harmless from and against any claims based upon or arising in connection with any such prior assignment, transfer, lien, and/or right, or any such purported assignment, transfer, lien, and/or right.

26. This Agreement may be executed in counterparts and each such counterpart shall be deemed to be an original executed agreement. The facsimile signature of the parties herein may be used instead of the original.

11



IN WITNESS HEREOF, the parties have executed this Agreement effective as of the date set forth in this Agreement.

_____  Date: 4/21/05
Samuel K. Freshman, an individual

_____  Date: 4/21/05
Helene Regen, an individual

_____  Date: 4-21-2005
Howard Regen, an individual

_____  Date: _____
Christopher M. Wolfington, an individual

COAST ATM

By: _____  Date: 4/21/2005
iGAMES ENTERTAINMENT, INC.

_____  Date: _____
Christopher M. Wolfington

MONEY CENTERS OF AMERICA, INC.

By: _____  Date: _____

AVAILABLE MONEY, INC.

By: _____  Date: _____
    Christopher M. Wolfington

12